**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In Re: | : | Chapter 7 |
| Arik Hadad, | : | |
| Debtor. | : | Case No. 06-14774  (JKF) |
| _____ | | |
| Kelly Beaudin Stapleton,<br>United States Trustee, | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| Arik Hadad, | : | Adversary No. 07-0164 |
| Defendant. | : | |
| _____ | | |

# MEMORANDUM OPINION

BY:   Jean K. FitzSimon
      United States Bankruptcy Judge

Before the Court is the Complaint of the United States Trustee seeking to deny discharge of the Debtor pursuant to Sections 727(a)(2)(A), 727(a)(3), and 727(a)(5) of the Bankruptcy Code.  A trial was held on February 19, 2008 and the parties submitted post-trial briefs.  This matter is now ripe for adjudication.  Upon consideration, the Court concludes that Mr. Hadad intended to hinder, delay, and

defraud his creditors.  He will therefore be denied a discharge pursuant to

11 U.S.C. § 727(a)(2)(A).  Alternatively, the Court finds that the Debtor's failure to

explain his loss of assets pursuant to § 727(a)(5) warrants denial of discharge.


# I.  BACKGROUND

### *Events Preceding and Including the Bankruptcy Filing*

The following facts are taken from the Debtor's bankruptcy schedules and

filings, as well as from the parties' Joint Pretrial Statement, and are not in dispute.

Arik Hadad filed for Chapter 7 bankruptcy protection on October 18, 2006.  On

the petition date, the Debtor was employed at Marshalls department store and

earned approximately $970 per month.  His income was approximately $19,000

in 2005 and $20,000 in 2004.  The Debtor is married, but his wife did not file for

bankruptcy.  Mrs. Hadad's monthly income is approximately $1,220.  The Debtor

and his wife have household expenses of about $2,165 per month.  Mr. Hadad

has over $123,000 in unsecured credit card debt from 17 credit cards.

The Debtor and his wife jointly own a home located at 1825 Carwithan

Street in Philadelphia (the "Property").  According to the Debtor, the Property is

worth $150,000 and is owned outright.[1]  The Debtor owns personal property

worth about $10,000.

---

[1]The Debtor claims an exemption of his house under 11 U.S.C. § 522(b)(3)(B) and asserts that the Property is owned jointly by him and his wife as tenants by the entirety.  See Answer ¶ 18.

2

In November 2005 (less than a year before filing for bankruptcy),

Mr. Hadad won $106,176 in the Pennsylvania lottery, the net proceeds of which

were $79,632 (the "Lottery Proceeds").  After receiving his lottery check, the

Debtor signed the check over to his wife and the two then paid off the mortgage

balance on the Property in the amount of $66,348.  The Debtor does not recall

exactly how he spent the remaining amount of the Lottery Proceeds.

The Debtor's initial Statement of Financial Affairs did not contain

information regarding the Lottery Proceeds (see Docket #1), but the lottery

winnings were listed on the Debtor's amended Statement of Financial Affairs (see

Docket #15), which was filed after the § 341 meeting of creditors.

### *Mr. Hadad's Credit Card Spending*

At trial, the United States Trustee admitted into evidence, as Exhibits 4-15,

twelve of Mr. Hadad's credit card statements which show activity from January

2005 through September 2006.  The Debtor did not object to the admission of

these statements.  While the record shows that Mr. Hadad used a total of 17

credit cards, Sandra Forbes of the Office of the United States Trustee testified

that no response to the Trustee's subpoena was received from five of the credit

card issuers.

The total activity from the twelve credit card account statements submitted

(including balance transfers, cash advances and goods and services, but

excluding finance charges) during the relevant time period was $126,795.  Most

of this debt - $62,187 of it - consists of balances transferred from other accounts.

Also, the statements show that Mr. Hadad took a total of $49,823 in cash

advances during this 20 month period.  The Debtor spent a total of $11,676 at

two merchants – Krewstown Beer and Beverage and Castor Beverage and

Tobacco.  Only $3,108 of the $126,795 in total indebtedness was spent on other

goods and services.

The total amount repaid to Mr. Hadad's twelve credit cards during the

relevant time period was $59,016.  However, it is not possible to determine how

much of this was actual payments by Mr. Hadad versus using cash advances and

balance transfers.  It is notable that the amount repaid is only $3,171 less than

the $62,187 incurred in balance transfers during this time.

## II.  LEGAL STANDARDS

Determining a complaint brought pursuant to § 727 of the Code usually

presents the Court with a difficult dilemma.  "A denial of discharge imposes an

extreme penalty and should not be taken lightly."  Stapleton v. Yanni (In re

Yanni), 354 B.R. 708, 712 (Bankr. E.D. Pa. 2006) (citations omitted).  Because it

is a harsh penalty, § 727 must be construed liberally in favor of the debtor and

against the party objecting to the discharge.  Rosen v. Bezner, 996 F.2d 1527,

1531 (3d Cir. 1993).  However, the Court must be mindful that one does not have

4

a constitutional right to a discharge.  In re Hoza, 373 B.R. 409 (Bankr. W.D. Pa.

2007) (citing U.S. v. Kras, 409 U.S. 434, 446 (1973)).  See also Carter

Engineering Co. v. Carter (In re Carter), 236 B.R. 173, 180 (Bankr. E.D. Pa.

1999) (noting that a bankruptcy discharge is a "privilege, not a right, and should

only inure to the benefit of the honest debtor") (citation omitted).

All elements necessary to establish discharge under § 727 must be proved

by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279 (1991);

Hoza, 373 B.R. at 414 (citing Watman v. Groman (In re Watman), 458 F.3d 26,

32 (1st Cir. 2006)).  See also In re Cohen, 142 B.R. 720, 726 (Bankr. E.D. Pa.

1992).  The Court has discretion in determining whether to grant the debtor a

discharge.  In re Cook, 146 B.R. 934, 940 (Bankr. E.D. Pa. 1992).


## III.   THE DEBTOR WILL BE DENIED DISCHARGE PURSUANT TO § 727(a)(2)(A)

Because Mr. Hadad intended to and did hinder, delay, and defraud his

many creditors when he shielded the Lottery Proceeds from their reach by

placing the funds in an asset owned jointly with his non-filing spouse, he will be

denied a discharge pursuant to 11 U.S.C. § 727(a)(2)(A).  This section of the

Code provides, in relevant portion, that "[t]he court shall grant the debtor a

discharge, unless "the debtor, with intent to hinder, delay, or defraud a creditor or

an officer of the estate charged with custody of property under this title, has

transferred, removed, destroyed, mutilated, or concealed . . . property of the

debtor, within one year before the date of the filing of the petition."  11 U.S.C.

§ 727(a)(2)(A).  In order to prevail in an action under § 727(a)(2)(A), the Trustee

must prove: (1) a transfer or removal, etc. of property; (2) belonging to the debtor;

(3) within one year of the petition date; and (4) an actual intent to hinder, delay or

defraud creditors.  The Bank of Chester County v. Cohen (In re Cohen), 142 B.R.

720, 725 (Bankr. E.D. Pa. 1992).  See also Hoza, 373 B.R. at 413 (citation

omitted); La Brioche v. Ishkhanian (In re Ishkhanian), 210 B.R. 944, 950 (Bankr.

E.D. Pa. 1997).  Proof of harm to creditors is not a requirement in order for a

plaintiff to receive relief under § 727(a)(2)(A).  Hanlon v. Ryan (In re Ryan), 285

B.R. 624, 630 (Bankr. W.D. Pa. 2002).  The intent that must be shown in element

four above must be actual, subjective intent; constructive intent will not suffice.

Hoza, 373 B.R. at 413-4 (citation omitted); Heer v. Scott (In re Scott), 294 B.R.

620, 633 (Bankr. W.D. Pa. 2003).

        Here, the central element in dispute is the question of Mr. Hadad's intent.

The Debtor does not deny that he signed the lottery check over to his wife; this

created a transfer of estate property.[2]  There is no question that the property in

question - the Lottery Proceeds - belonged to the Debtor, thus satisfying element

---

[2] "Transfer" is defined by the Bankruptcy Code as, among other things, the "absolute or
conditional, voluntary or involuntary . . . disposing . . . or parting with- (i) property; or (ii) an
interest in property."  11 U.S.C. § 101(54)(D).  Mr. Hadad's argument that the Lottery Proceeds
were jointly held by the Debtor and his wife from the start - which implies that no transfer of the
assets took place - is discussed in Section IV, *supra*.

two.  This transfer occurred in November 2005 and Mr. Hadad filed for

bankruptcy in October 2006; hence the removal of property from the estate took

place within one year of the petition date.

     This leaves us for the moment with the thorny question of Mr. Hadad's

intent (or the fourth element of the test outlined above).  The Debtor contends

that he signed the lottery check over to his wife and used the money to pay off

the mortgage on their home, rather than paying down the balance on his credit

cards, after he and Mrs. Hadad "made a joint decision that . . .  it would be best to

pay off the mortgage on their house so that Debtor did not spend the money in a

reckless manner."  (Answer, ¶19.)  The Trustee, on the other hand, asserts that

the Debtor's actions "do not pass the proverbial 'smell test.'"  (Brief, pg. 8.)  As

discussed below, upon examining the facts and circumstances surrounding

Mr. Hadad's decision to ignore his credit card debt when disposing of his lottery

windfall, the Court concludes that the Debtor's intent was, at a minimum, to

hinder and delay his creditors.

     Due to the fact that a debtor's actual intent to hinder, delay or defraud is

difficult to prove, courts have identified "badges of fraud" which are indications

that actual intent on the part of the debtor exists, <u>Cohen</u>, 142 B.R. at 728 (citation

omitted), and "strongly suggest that a transaction's purpose is to defraud

creditors unless some other convincing explanation appears."  <u>In re Spitko</u>, 357

B.R. 272, 301 (Bankr. E.D. Pa. 2006) (citation omitted).  These "badges of fraud"

commonly include:

> (1) the transfer or obligation was to an insider;

> (2) the debtor retained possession or control of the property transferred after the transfer;

> (3) the transfer or obligation was disclosed or concealed;

> (4) before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

> (5) the transfer was substantially all of debtor's assets;

> (6) the debtor absconded;

> (7) the debtor removed or concealed assets;

> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

> (10) the transfer occurred shortly before or after a substantial debt was incurred; and

> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the business.

In re Glunk, 342 B.R. 717, 734 n.30 (Bankr. E.D. Pa. 2006).  See also In re

Jacobs, 381 B.R. 147, 164 (Bankr. E.D. Pa. 2008) (citing In re Crater, 286 B.R.

756 (Bankr. D. Ariz. 2002)); In re Coven, 2007 WL 1160332, at *7 (D.N.J.

Apr. 17. 2007) (noting that the totality of circumstances should be considered).

While it is possible to establish intent based on a strong finding with regard to just one badge of fraud, see Cohen, 142 B.R. at 728 (citation omitted), following trial and a review of the pleadings, the Court finds that the Trustee has satisfied the burden of proving, by a preponderance of the evidence, that it was Mr. Haddad's intent to hinder, delay, and defraud his creditors. Specifically, at least seven badges of fraud have been demonstrated with regard to Mr. Hadad's removal of the Lottery Proceeds from his bankruptcy estate – namely badges of fraud numbers one, two, three, five, seven, nine, and ten.

First, with regard to badge of fraud number one, the transfer was to an insider. The term "insider" includes a "relative of the debtor," 11 U.S.C. § 101(A)(I). The Debtor essentially gave half of his lottery winnings to his wife when he signed the check over to her and paid off the house that was owned by them jointly. Transfers between relatives are "carefully scrutinized." In re Horob Livestock, Inc., 382 B.R. 459, (Bankr. D. Mont. Dec. 17, 2007). See also In re Lang, 246 B.R. 463, 470 (Bankr. D. Mass. 2000) ("[m]ost courts agree that when a debtor transfers property gratuitously or to relatives in the shadow of a bankruptcy filing, a presumption of fraudulent intent arises") (citing cases); In re Chastant, 873 F.2d 89, 91 (5th Cir. 1989) ("a presumption of actual fraudulent intent necessary to bar a discharge arises when property is either transferred gratuitously or is transferred to relatives.") (internal citations and quotations omitted). Rather than rebutting the presumption of fraud which arises due to the fact that he has transferred property

9

to his relative, Mr. Hadad chooses to focus his response exclusively on the underlying transfer.[3]  (Response to Trustee's Brief, pg.1).  Given the Debtor's use of post office boxes and other addresses for the credit cards, the Court finds that his intent was to hinder, delay, or defraud his creditors.[4]

With regard to the second badge of  fraud, there is no question that the Debtor retained possession of his property in that he continues to live in and own his home.  (See Schedule A.)  See also In re Marrama, 445 F.3d 518, 524 (1st Cir. 2006) (noting the "common fact pattern seen in § 727(a)(2)(A) cases of a debtor who transfers property to a family member or close friend but retains the control or enjoyment of the transferred assets") (internal quotation and citation omitted); In re Spitko, 357 B.R. at 302 ("[t]he retention of the use of transferred property very strongly indicates a fraudulent motive underlying the transfer.").

The Trustee notes that the third badge of fraud is present here in that the Debtor initially concealed his transfer by failing to list the Lottery Proceeds on his initial schedules or Statement of Financial Affairs.  (See Docket #1.)  It was not

---

[3] Mr. Hadad, in fact, asserts this argument - that he did not actually "transfer" assets because the Lottery Proceeds were joint assets of his and Mrs. Hadad when they were received - in response to other allegations regarding badges of fraud (see e.g. response to allegation with regard to badge of fraud number five and eight; Response, pgs. 2 and 3).  Because this argument by the Debtor is taken up in a separate Section of the Opinion (Section IV, below), it will not be addressed here.

[4] The Court's analysis of Mr. Hadad's credit card activity is based on the Trustee's Exhibits 4 through 15.  Mr. Hadad did not object to the admission of these exhibits and they were admitted into evidence at the conclusion of the trial.  Records of five of Mr. Hadad's credit card statements were not produced by either party and were therefore not examined by the Court.  However, no testimony or evidence produced suggest that these five missing credit card statements would reveal results that differ in any way from the conclusions reached.

until after questioning by the Trustee at the § 341 meeting that the Debtor

amended his Statement of Financial Affairs to include notation of the Lottery

Proceeds.  (See Docket #15.)  Mr. Hadad calls this omission an "oversight," but

viewed in light of the pattern of deception that has emerged in this case,[5] the

Court is not inclined to give the Debtor the benefit of the doubt.  (Response,

pg. 2.)  See In re Keck, 363 B.R. 193, 199 (Bankr. D. Kan. 2007) (noting that the

Debtor's failure accurately to complete his statement of financial affairs was a

badge of fraud in a case with similar facts).

Mr. Hadad does not dispute that the Lottery Proceeds were substantially all

of his assets, (see Response, pg. 2), and thus badge of fraud number five exists

here.  The Debtor also concedes that he deposited the Lottery Proceeds into his

wife's checking account, (see Id.), and thus admits that badge number seven -

that the Debtor removed or concealed assets - is present here.  Mr. Hadad's

protestation that "he was not attempting to remove assets of the estate to defeat

creditors' claims" is not enlightening.  (Id.)  As previously discussed, the badges

of fraud analysis provides courts with circumstantial evidence of a Debtor's intent.

In re Beverly, 374 B.R. 221, 243 (9th Cir. B.A.P. 2007).  Therefore, the Debtor's

---

[5] For example, Mrs. Hadad testified that she had no idea the Debtor had 17 credit cards and owed over $120,000.  Mrs. Hadad discovered this by running a credit check on her husband.  Further, the Court did not find Mr. Hadad to be a credible witness.  Mr. Hadad testified that he continued to pay his credit card bills after receiving the check from the lottery in February 2006.  Yet an examination of his credit card statements (Trustee Exhibits 4-15) shows that there was almost no activity on the cards during this time.

offering an unsupported conclusion regarding the very question the Court is investigating is not helpful.

The ninth and tenth badges of fraud are present here as well.  The Debtor certainly was insolvent at the time of the transfer, which occurred shortly after he had run up the sizable balances on the credit cards.  Mr. Hadad does not contend otherwise.

The Debtor does point to two cases he asserts demonstrate that it is permissible to engage in pre-bankruptcy planning.  Mr. Hadad argues that Wudrick v. Clements, 451 F.2d 988 (9th Cir. 1971) stands for the proposition that debtors may convert "non-exempt assets to exempt assets."  (Response, pg. 3.) While it is true that the Wudrick court held that the debtor's obtaining a loan on his car and converting a portion to exempt assets was not fraudulent, this 37 year-old case is distinguishable in at least two ways.  451 F.2d at 990.  First, the Court in Wudrick addressed neither the badges of fraud nor § 727(a)(2)(A) in concluding that the debtor did not fraudulently remove property from his estate. Second, 11 U.S.C. § 522(o), which eliminates a debtor's right to convert a non-exempt asset to a homestead exemption was "obviously added to the Bankruptcy Code by Congress to curb a perceived abuse by debtors" of the rule outlined by Wudrick and cited by the Debtor.  In re Lacounte, 342 B.R. 809, 813 (Bankr. D. Mont. 2005).

The other case cited by Mr. Hadad, In re Bernier, 282 B.R. 773 (Bankr. D. Del. 2002), is equally unpersuasive.  The Bernier Court does go through the

12

§ 727(a)(2)(A) badges of fraud analysis, but concludes that the Plaintiff did not

establish his burden where there was no showing either that the Debtor owned

the note in question or that she had a fraudulent intent in selling it at a discount

prior to satisfying the judgment of the Defendant.  While Mr. Hadad compares

Bernier to his case, the facts are dissimilar.  In Bernier, the Debtor used the cash

in question to pay off past due mortgage payments and one month advance

mortgage payment while she was facing foreclosure.  282 B.R. at 785.  The Court

noted that such payments were not unusual for the Debtor and did not

demonstrate a fraudulent intent, particularly when one considered that she was

faced with a foreclosure action.  282 B.R. at 786.  Additionally, it was not clear

that the Debtor in Bernier was aware of the Plaintiff's judgment.  282 B.R. at 783.[6]

Mr. Hadad, on the other hand, paid off his entire mortgage at a time when, as he

testified, he was aware that he owed a large amount of credit card debt.  It surely

was not in the ordinary course for the Debtor to pay $66,348 in mortgage debt in

a lump sum while ignoring over $120,000 in credit card debt.  Thus the Bernier

case is inapposite because it is a fact specific analysis of a much different

scenario.

The sum of the badges of fraud analysis is that a court may "deduce

fraudulent intent from all of the facts and circumstances of the case."  In re

---

[6] The Bernier Court, in finding no evidence of fraud in the transaction, noted "a debtor is
not allowed to convert assets for fraudulent purposes.  A conversion is fraudulent if extrinsic
evidence, beyond the conversion itself established that the debtor acted with intent to hinder,
delay or defraud creditors."  282 B.R. at 785 (citations omitted).

Dawley, 2005 WL 2077074, at *11 (Bankr. E.D. Pa. Aug. 10, 2005).  Here, the facts and circumstances paint a picture of a man who was attempting to keep his lottery winnings for himself and his family instead of paying his unsecured credit card debt.  One of the key points of testimony at trial was Mr. Hadad's admitting that he continued to keep his credit card debt a secret from his wife while the two of them discussed and decided to pay off their entire mortgage debt with the Lottery Proceeds.  In other words, the Debtor rid himself of any home payment knowing full well that he owed over $120,000 in unsecured debt on his credit cards.  This is not the action of an "honest but unfortunate debtor" seeking a fresh start.  Marrama v. Citizens Bank of Massachusetts, 127 S.Ct. 1105, 1107 (2007) (citation omitted).  The Court, therefore, concludes that, within a year of filing for bankruptcy, Mr. Hadad hindered, delayed, and defrauded each of his unsecured creditors by placing the Lottery Proceeds in his home.  Therefore, Mr. Hadad will be denied a discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

## IV.  THE DEBTOR'S ASSERTION REGARDING THE CHARACTERIZATION OF THE LOTTERY PROCEEDS AS A JOINT ASSET IS INCORRECT

Mr. Hadad insists that the Trustee and his creditors have nothing to complain about because the Lottery Proceeds were "a joint asset of [the] Debtor and his wife and, therefore, would have been protected from the claims of his unsecured creditors even if [the] Debtor had not used the proceeds to pay off his

14

mortgage." (Answer, ¶18.) That is, the Debtor asserts that the Lottery Proceeds were never available to his creditors. This argument is wrong. The Lottery Proceeds were available to Mr. Hadad's creditors until he attempted to convert them to an exempt asset by paying off the home he holds jointly with his non debtor spouse. See e.g. Constitution Bank v. Olson, 423 Pa.Super. 134 (1993). The Debtor makes three major points regarding the characterization of the Lottery Proceeds. They are addressed in turn.

First, Mr. Hadad's most basic assertion, which he repeats and relies on often, is that "the facts of this case do not give rise to a true transfer . . . the lottery winnings were treated as entireties property and were used to pay off a joint asset." (Response, pgs. 1-2.) It is true that property held as *tenants by the entireties*[7] may not be reached by the creditor of a single spouse. See e.g. Constitution Bank v. Olson, 423 Pa.Super. 134 (1993). However, the case relied on by the Debtor holds that the lottery proceeds are "marital property," rather than entireties property. Nuhfer v. Nuhfer, 410 Pa.Super. 380, 381 (1991). This is an important distinction; "[e]ven though, in general, lottery proceeds won during the couple's marriage constitute marital property, that does not mean that the winnings should be treated like entireties property." Livingston v. Unis, 659 A.2d 606, 611 (Pa. Cmwlth. 1995). See also Farris v. Jefferson Bank, 194 B.R. 931,

---

[7] A tenancy by the entirety is a unique form of ownership by a husband and wife that exists when property is placed in the name of both spouses. In re DelCorso, 382 B.R. 240, *6 (Bankr. E.D. Pa. 2007) (citing Clingerman v. Sadowski, 513 Pa. 179 (1986)). Each spouse has an undivided interest in the property and all of the rights arising from the possession. Id.

15

941 n.12 (Bankr. E.D. Pa. 1996) ("[t]he presumption that all property coming into the marriage is matrimonial property is not equivalent to the creation of entireties property, which requires that the property be acquired in joint names of husband and wife") (citing Fratangelo v. Fratangelo, 360 Pa.Super. 487, 498 (1987)).

The Debtor does not contend that the lottery check was acquired jointly by him and his wife. To the contrary, Mr. Hadad testified that the lottery check was made out to him. He also testified and states in his Brief that he needed his wife to cash the lottery check for him because he did not have a checking account in his name. (Pg. 3.) If the lottery check were entireties property, per the definition cited above, it would have been made out jointly to Mr. and Mrs. Hadad and the Debtor would not have faced the issue of where to get the check cashed. This was not the case. The Debtor further testified that he kept his credit card debt and gambling a secret from his wife. It would, therefore, make no sense for the lottery check to be made out to both Mr. Hadad and his wife, a necessary precondition for treating the Lottery Proceeds as entireties property. In addition, the winning lottery ticket was likely bought with one of Mr. Hadad's 17 credit cards; the submitted credit card statements and in court testimony show that The Debtor spent a total of $11,676 at two merchants that sell lottery tickets (Krewstown Beer and Beverage and Castor Beverage and Tobacco). Mrs. Hadad was not a holder of any of the 17 credit cards. The Lottery Proceeds were not acquired jointly by Mr. and Mrs. Hadad.

The Debtor's second argument for classifying the Lottery Proceeds as entireties property is that pursuant to 23 Pa. C.S.A. § 3501 (b) of the Pennsylvania Code, all property acquired during marriage is presumed to be marital property.  The Debtor, however, misinterprets this section of Pennsylvania law, which the Third Circuit holds is intended to apply only in the event of divorce. See  U.S. v. Premises Known as 717 South Woodward Street, Allentown, Pa., 2 F.3d 529, 535 (3d Cir. 1993) ("The primary objective of § 3501 is clearly to designate the property that is subject to disposition by the court in a divorce proceeding . . .  the Pennsylvania Superior Court has declined to read the marital property provision as conferring an ownership interest outside the context of equitable distribution."); In re Delcorso, 382 B.R. 240, *10 (Bankr. E.D. Pa. 2007) (concluding that 23 Pa. C.S.A. § 3501 "pertains only to issues arising out of domestic relations difficulties in a marriage"); U.S. v. Strube, 58 F.Supp. 2d 576, 584 (M.D. Pa. 1999) (refusing to deem property marital property simply because it was purchased during marriage); In re Farris, 194 B.R. 931, 941 n.12 (Bankr. E.D. Pa. 1996) ("[i]mportantly, the concept of marital property [under § 3501] arises only in the context of divorce, when the spouses' marital property is being equitably divided.") (citing U.S. v. Premises).  The section cited by the Debtor simply does not apply.  The Lottery Proceeds were owned exclusively by Mr. Hadad at the time they were won.

17

The third and final argument Mr. Hadad makes in support of his contention that the Lottery Proceeds are entireties property is that "the controlling consideration . . . is intention." (Brief, pg.1).  Hengst v. Hengst, 491 Pa. 120 (1980), one of two cases relied on by the Debtor to support this argument has been distinguished by this Court.  See In re DelCorso, 382 B.R. 240, * 8-9 (Bankr. E.D. Pa. 2007).  While it is true that the property in Hengst was deemed to be entireties property based on the married couple's practice and treatment over the course of years, the Court specifically noted that the decision was made "under the special circumstances of this case . . ." and that "no third party is even remotely affected."  Hengst, 491 Pa. at 123, 122.  In this case, Mr. Hadad's practice and treatment over the course of years was to hide his lottery playing from his wife.  In fact, the Debtor testified that it was necessary for him to turn the lottery check over to his wife due to the fact that he did not have a bank account in his own name.  In other words, it was logistical circumstances which caused Mr. Hadad to share the Lottery Proceeds.  Even assuming that Mr. Hadad and his wife intended to create entireties property - which the Court is not prepared to find - Hengst does not stand for the proposition that spouses may simply covenant to create such types of property.

The additional case cited by the Debtor, Heatter v. Lucas, 367 Pa. 296 (1951) is further off point than Hengst, as it discusses the intention of the *grantor* of the property, rather than the intention of the parties who possess the property. The Debtor certainly makes no argument that the Pennsylvania Lottery intended

for him and his wife to hold the Lottery Proceeds as entireties property.

Therefore, the Debtor offers no convincing evidence to support his contention that

the Lottery Proceeds are entireties property or to rebut the finding that his debts

should be found nondischargeable pursuant to § 727(a)(2)(A).


## V.  THE DEBTOR FAILED SATISFACTORILY TO EXPLAIN HIS LOSS OR DEFICIENCY OF ASSETS PURSUANT TO § 727(a)(5)

Even if Mr. Hadad had not hindered, delayed, and defrauded his unsecured

creditors by paying his mortgage with the Lottery Proceeds - thus warranting

denial of discharge pursuant to § 727(a)(2)(A) - he would nonetheless be denied

a discharge pursuant to 11 U.S.C. § 727(a)(5).  This section provides, in relevant

part, that the court shall grant the debtor a discharge unless he "has failed to

explain satisfactorily . . .  any loss of assets or deficiency of assets to meet the

debtor's liabilities."  The Trustee alleges that "[b]ased on the extraordinary and

vague responses from the Debtor and the complete lack of explanations

furnished by the Debtor. . .  the Debtor has failed to satisfactorily explain his loss

of assets or his deficiency of assets."  (Complaint, ¶ 27.)  After analyzing

Mr. Hadad's testimony in conjunction with the information on the credit card

statements provided by the U.S. Trustee, the Court concludes that Mr. Hadad has

in fact failed to explain his loss and deficiency of assets - in particular the large

amount of cash advances and other charges on his credit cards.  The Debtor's discharge will, therefore, be denied pursuant to § 727(a)(5).[8]

Section 727(a)(5) fosters a process of complete and accurate debtor disclosure.  In re Ryan, 285 B.R. 624, 632 (Bankr. W.D. Pa. 2002).  Unlike § 727 (a)(2)(A), there is no requirement under § 727(a)(5) that a debtor act fraudulently or intentionally in order to sustain an objection to discharge.  Ishkhanian, 210 B.R. at 953; Ryan, 285 B.R. at 632.  The analysis under § 727(a)(5) uses a burden shifting framework.  Yanni, 354 B.R. at 716.  The objecting party must first show, by a preponderance of the evidence, that the debtor at one time owned assets that are no longer available to his creditors.  Sonders v. Mezvinsky (In re Mezvinsky), 265 B.R. 681, 689 (Bankr. E.D. Pa. 2001).  Once that burden has been satisfied, the burden shifts to the debtor to offer a "satisfactory explanation" for the fact that the assets in question are not available.  Yanni, 354 B.R. at 716; Mezyinsky, 265 B.R. at 689; PNC Bank v. Buzzelli (In re Buzzelli), 246 B.R. 75, 116 (Bankr. W.D. Pa. 2000).  In other words, all the plaintiff must do is identify a missing asset, and then it becomes incumbent on the debtor to explain what happened to that asset.  Id. (citation omitted.)  The debtor has the ultimate burden of persuasion.  Carter, 236 B.R. at 180 (citations omitted.)

---

[8] The Complaint also states a Count pursuant to 11 U.S.C. § 727(a)(3), which denies a discharge when "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . ."  Because no evidence was presented with regard to this portion of the Complaint at trial, the Court will not devote discussion to the issue.

Unlike with a cause of action under § 727(a)(3), a debtor cannot offer a justification for the failure to satisfactorily explain the loss of assets under § 727(a)(5). Yanni, 354 B.R. at 716. It is within the court's discretion to determine what constitutes a "satisfactory" explanation for the loss of assets. Yanni, 354 B.R. at 716 (internal quotations and citations omitted); Buzzelli, 246 B.R. at 117 (noting that "vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory") (citation omitted); Mezyinsky, 265 B.R. at 689-90 (noting that "explanations of a generalized, vague, indefinite nature such as assets being spent on 'living expenses,' unsupported by documentation, are unsatisfactory.") (citations omitted). For a debtor's explanation to be satisfactory, it must "convince the judge that the debtor has not hidden or improperly shielded assets . . . . General assertions that money was spent on living expenses or lost through gambling, without documentation, are unacceptable." Carter, 236 B.R. at 180-1 (citations omitted).

Here, Mr. Hadad fails to justify his loss of assets, specifically what became of the nearly $50,000 in cash advances and balance checks that he withdrew or redeemed from his credit cards and thus a denial of discharge pursuant to the § 725(a)(5) standard outlined above is warranted. The Trustee satisfies his burden of proof by identifying the fact that the Debtor took large amounts of cash advances from his credit card which are not available for creditors. Ryan, 285 B.R. at 632 (citation omitted). The burden has thus shifted to Mr. Hadad to

21

provide a "satisfactory explanation" for what happened to the cash.  Yanni, 354

B.R. at 716.  At this point it is the Debtor's burden of persuasion; he must

satisfactorily show the Court where he spent this money.  Carter 236 B.R. at 180.

Mr. Hadad does not dispute that the cash advances he took out on his credit

cards are not available to his creditors.  But he did offer an explanation at trial

regarding where all this money went: Mr. Hadad said that he used the cash

mainly to pay his credit card bills, but also at restaurants and for every day living

expenses.  For three reasons discussed below, the Court does not find the

Debtor's explanation credible and, therefore, denies him discharge on Count III of

the Complaint.

First, Mr. Hadad's primary explanation that he took cash advances in order

to pay credit card bills does not jibe with the facts on record.  The story of the

Debtor's financial life may be gleaned not from his testimony, but from the 12

credit card statements the Trustee submitted at trial, which show activity from the

time period of January 2005 through September 2006.  The total activity for these

12 accounts during this time period was $126,795.  Of this, nearly half, or

$62,187 was incurred by transferring balances between accounts.  The total

amount repaid to Mr. Hadad's creditors during this time period was $59,016.[9]

While the credit card statements do not consistently indicate the source of

---

[9] The total amount repaid and the amount incurred through balance transfers need not
be equal because, as stated, Mr. Hadad had five other credit cards which are not reflected in
this study and which he was presumably paying with these same balance transfers.

payment, it is possible to trace certain large payments to one account from balance transfers into other accounts.  For example, in July 2005, Mr. Hadad's Chase account ending in 0101 (Trustee Ex. 7) shows a payment of $4,000 and his Citi account ending in 1508 (Trustee Ex. 12) shows a $4,000 balance transfer to Chase.  Similarly, Mr. Hadad's July 2005 Chase/BankOne account ending in 0992 (Trustee Ex. 9) shows a $2000 payment and his Citi account ending in 1508 (Trustee Ex. 12) shows a $2000 balance transfer to BankOne.  This belies Mr. Hadad's testimony that he paid the balances on his credit cards primarily with money orders and not with balance transfers.[10]

The second reason the Court doubts the testimony provided by Mr. Hadad regarding his spending habits is that the Debtor did not provide a credible explanation for certain charges on his credit cards.  For example, the Debtor's credit card statements reveal that the Debtor spent a total of $11,676 at two merchants - Krewstown Beer and Beverage and Castor Beverage and Tobacco - in the months of January and February 2006 alone.  During the trial, Mr. Hadad was asked by the Trustee why there were so many large charges in such a short period of time at Krewstown Beer and Beverage.  Mr. Hadad first said that he was buying beer and cigarettes, but could not explain two charges for $1,000 on the same date at Krewstown.  Mr. Hadad then answered by saying "I don't know."

---

[10] The Court has reviewed Exhibit D1, provided by the Debtor, showing a total of $3,410 in 15 money order receipts.  However, this amount represents a very small percentage of the $59,016 repaid to these 12 credit cards.

23

When questioned by his own counsel, the Debtor finally offered that he was purchasing many lottery tickets at Krewstown.  Mr. Hadad provides, at best, a vague and indefinite - and, therefore, an unsatisfactory - explanation of why he was spending thousands of dollars at a beer and liquor store.  Mezyinsky, 265 B.R. at 689-90.  Nor is it acceptable for the Debtor simply to say that he gambled away his money, without documentation and further explanation.  Carter, 236 B.R. at 180-1.  Therefore, none of the Debtor's recollections satisfies the Debtor's burden of providing the Court with a satisfactory explanation of his loss of assets pursuant § 727(a)(5).

Finally, the Court is troubled by the basic fact that Mr. Hadad was taking out such large amounts of cash, borrowing so much money while earning so little, spending very little on basic necessities,[11] and all the while claiming to remember next to nothing about his financial history or health.  As Judge Frank of this Court concluded recently in a case with similar facts

> What troubles me . . . is the inadequacy of the explanation.  [The Debtor] consistently testified that he just did not remember what happened to the money . . . .  Section 727 puts some onus on the Debtor to retrace his steps and put some of the puzzle pieces back together . . . .  Once the UST made out its prima facie case, it became the Debtor's burden to come up with a discernable explanation for the excessive amounts of cash advances.  The bottom line is, he has not done so.  I must deny the discharge on that basis.

---

[11] Despite his testimony that he often used his credit cards for basic necessities, the credit card statements show that Mr. Hadad spent only $3,108 on such transactions between January 2005 and September 2006.  Moreover, although the Debtor testified that he often used his credit cards at restaurants, not a single restaurant charge was found on these credit card statements.

In re Yanni, 354 B.R. at 720.  Mr. Hadad's credit card statements show that he

often took out large amounts of cash at a time.  For example, the Debtor took two

$500 cash advances from the same ATM from his Bank of America account

ending in 9914 (Trustee Ex. 4).  In fact, Mr. Hadad took $500 cash advances from

that same account on the 11th, 14th, 19th, 21st, 23rd, 26th, and 27th of

November 2005.  It is up to Mr. Hadad to explain what happened to this money

and he has not done so.  Discharge is, therefore, denied pursuant to § 727(a)(5).


# VI. CONCLUSION

The Court concludes that the Debtor's actions after winning the lottery in

November 2005 and prior to filing for Chapter 7 bankruptcy protection in October

2006 warrant denial of discharge.  Mr. Hadad intended to hinder, delay, and

defraud creditors by transferring the Lottery Proceeds to a secure asset - his

home - to place it out of his creditors' reach.  Therefore, discharge is denied

pursuant to 11 U.S.C. § 727(a)(2)(A).  In addition, the Court concludes that

Mr. Hadad failed to explain how he acquired over $120,000 in credit card debt

and what he did with the large amount of cash that was advanced to him.

Therefore, discharge is denied pursuant to 11 U.S.C. § 727(a)(5).

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In Re: | : | **Chapter 7** |
| **ARIK HADAD,** | : | |
| Debtor. | : | **Case No. 06-14774  (JKF)** |

_____

| | | |
|---|---|---|
| **KELLY BEAUDIN STAPLETON,**<br>**United States Trustee,** | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| **ARIK HADAD,** | : | **Adversary No. 07-0164** |
| Defendant. | : | |

_____

# ORDER

This 21st day of May, for reasons discussed in the Memorandum Opinion,
it is hereby ordered that the relief sought in the above-captioned adversary is
**granted**.  The Debtor, Arik Hadad, is **denied** a **discharge** pursuant to 11 U.S.C.
§ 727(a)(2)(A) and 11 U.S.C. § 727(a)(5).

_____
JEAN K. FITZSIMON
United States Bankruptcy Judge

Copies to:

David M. Klauder, Esquire
Office of the United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA  19107

Bradley E. Allen, Esquire
7711 Castor Ave.
Philadelphia, PA  19152